UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JAMES HURT JR.,

                            Plaintiff,                          15-cv-7612 (PKC)

            -against-                                          OPINION
                                                               AND ORDER

THE CITY OF NEW YORK, a municipal
entity, NYPD SERGEANT MICHAEL
CONNIZZO (Shield 1391, Tax ID
932485), and NEW YORK CITY POLICE
OFFICERS "JOHN DOES" 1-2,

                            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            A jury of ten was empaneled to hear the claims of plaintiff James Hurt Jr.

against Michael Connizzo, a sergeant in the New York City Police Department

("NYPD"), and the City of New York ("City").  The trial centered upon an alleged

unlawful arrest, unlawful search and excessive use of force against Hurt by Connizzo,

and a claim that Hurt was negligently struck by an unmarked police car.  Connizzo

denied that he was involved in any incident involving Hurt.  Hurt also pursued an

alternate theory, premised on state law, that an unidentified member of the NYPD had

engaged in an assault, battery, unlawful detention, and negligently hit him with an

unmarked police vehicle; on that alternate state law theory, he urged that the City was

vicariously liable for the acts of its employee.

            On February 8, 2019, the jury returned a verdict in favor of Connizzo on

all claims.  However, the jury did find that Hurt had proven that an unidentified member

of the NYPD, other than Connizzo, had assaulted him, battered him and negligently

injured him.  The jury found that the unidentified officer was acting within the scope of his authority as an employee of the City.  The jury awarded $500,000 on the assault claim, $500,000 on the battery claim and $350,000 on the negligence claim.

The jury's verdict meant that no liability was found on the section 1983 claim against the only identified officer alleged to have personally participated in the actions directed to Hurt.  All section 1983 theories of liability against the City itself had been dismissed on summary judgment.  (Opinion and Order, Aug. 22, 2018 at 8-9; Doc 88.)  Thus, the jury's verdict stands on its findings that state-law claims were proven against an unidentified officer of NYPD for whom the City was vicariously liable under the doctrine of respondeat superior.

Defendant City moves for judgment as a matter of law asserting that there was no evidence presented that any unidentified police officer was acting in furtherance and within the scope of his employment.  The City also moves for judgment asserting that the evidence regarding plaintiff having been hit by a car was consistent only with intentional conduct and not negligent conduct.  The City also moves for a new trial on assorted grounds, including that the verdict was against the weight of the evidence.  It also moves for a remittitur of damages.

The motions will be denied, except that the Court will grant remittitur as discussed below.

<u>The Trial</u>

Hurt testified that he lived with his parents his entire life, graduated from Cardinal Hayes High School and received a degree in medical administration from Monroe College.  (Tr. 99.)  On July 1, 2014, then age 23, he attended a barbecue at the

home of a high school friend; he brought work clothes (a blazer, shoes, etc.) with him because he would later be working as a security guard.  (Tr. 105, 189.)  He planned to go from the barbecue to his girlfriend's home.  (Tr. 105.)  He did not drink alcohol at the party.  (Tr. 106.)

When he left the party, he hailed a livery cab and gave the driver his girlfriend's address.  (Tr. 108.)  He was on the phone with his girlfriend (around 1:51 a.m. on July 2) when the cab was stopped by a car that pulled from behind.  (Tr. 110, 145.)  It was a light-colored sedan with no markings but with flashing red and blue lights on the dashboard.  (Tr. 111-112.)  Two officers approached the cab; the one on the driver's side asked the driver where he was taking the passenger, and the driver gave the address.  (Tr. 113.)  The officer had around his neck a beaded chain with a "gold badge."  (Tr. 113.)  A different officer approached the back-rear passenger door and did not have a police shield around his neck.  (Tr. 112.)  In the courtroom, Hurt identified Connizzo as the officer who came to the back-rear door.  (Tr. 113-14.)  The officer asked Hurt if he had hung up the phone and then asked him to step out of the car.  (Tr. 114.)  Hurt's duffel bag with work clothes remained in the car.  (Tr. 115.)  Hurt testified that he put his hands up and said, "I don't condone searches."  (Id.)  According to Hurt, Sergeant Connizzo said that this was his tenth stop and that he was looking for concealed weapons.  (Tr. 116.)  Hurt denied having any weapon, but he was personally searched.  (Id. (he "dug inside my pockets . . . .").)

After the search, Hurt was instructed by Connizzo to step to the back of the livery cab and to turn facing the unmarked car.  (Tr. 117-118.)  Connizzo was in the back seat of the livery cab where the duffel bag was located.  (Tr. 118.)  Hurt turned

around, looking in the direction of the cab, and showed the officer his father's

Department of Corrections mini-shield; he was told to put it away.  (Tr. 119.)  At some

point Hurt turned and looked over his shoulder to see what the offer was doing; he asked,

"What are you guys looking for?" (Id.)  "And as soon as I could even get the words out,

he struck me with his forearm, he pushed me." (Id.)  Hurt stumbled back and hit the back

of the car; he was pushed into the hood of the car and fell to the ground.  (Tr. 119, 121.)

Hurt testified that it was the other officer, not Connizzo, who shoved him into the hood of

the car.  (Tr. 120.)  "As I'm getting up, the officer that came to the left side of me, he

pulled my left arm to the back, as I'm getting up, and Connizzo comes over." (Tr. 121.)

According to Hurt, it was at this point that Connizzo came to his right side and punched

him in the mouth three times.  (Tr. 121-122.)

       Hurt testified that he "was terrified.  I didn't know if this was going to be

my last night.  I took matters into my own hand and I ran." (Tr. 122.)  He ran opposite

the direction of the livery cab and passed the unmarked car.  (Tr. 135.)  The unmarked car

made a U-turn and "[a]s I'm running the car is swerving into me, and I'm still running."

(Tr. 136.)  "As I get towards the end of the block, the car jumped the curb, hit my leg, my

left leg, and I fell into the fence." (Id.)  The car did not crash into anything.  (Id.)  The

right headlight of the car hit his knee.  (Tr. 215.)  Hurt never turned back to see if the

officers got out of their vehicle; he climbed and jumped over a fence and went into an

alleyway.  (Tr. 137.)  He later hopped a second fence.  (Tr. 141.)  He was bleeding and in

pain.  (Tr. 142.)

       Hurt had his phone with him, but at this point the battery was dying and he

only had enough power to call his girlfriend.  (Tr. 142.)  He asked her to call his parents

and the phone went dead.  (Tr. 151.)  After daybreak, Hurt located a stranger who allowed Hurt to call his mother (with the stranger dialing the number) and Hurt was able to give his location to his mother.  (Tr. 152-155.)  His mother and father arrived at his location and his father drove him to St. John's Riverside Hospital in Yonkers where he was treated in the Emergency Room.  (Tr. 155, 161, 229.)  The extent of Hurt's injuries will be discussed later in this Opinion.

Sergeant Connizzo, who was assigned to the Bronx Anti-Crime Unit at the time of the incident (Tr. 339), denied that he was involved in any manner and claimed that he was not on the job at the time the incident is alleged to have taken place.  The City denied that any officers of the NYPD were involved in the incident described by Hurt.

Sergeant Connizzo's contention that he was not working at the time of the incident was a hotly contested issue at trial and in a pretrial summary judgment motion. (Opinion and Order, Aug. 22, 2018, pp. 3-7; Doc 88.)  The gist of the dispute was Sergeant Connizzo's assertion that he had left work around midnight, before the incident, because he had a work-related court appearance in the morning; Hurt pointed out that Connizzo had not signed out from work as another officer reporting to court with him had done.  (e.g. Tr. 372-373.)  The jury resolved this issue in Sergeant Connizzo's favor, and no party seeks to disturb the jury's verdict with respect to him.  But because Sergeant Connizzo's testimony was relevant to the question of whether some NYPD officer or officers had engaged in wrongful conduct, the Court reviews portions of his testimony.

One member of the Bronx Anti-Crime Unit called by Hurt testified that a plain-clothes unit targets violent crime, including gun possessions, and that, as part of that unit, officers make car stops.  (Tr. 340-342.)  The officer explained that the NYPD's

"TRIP program" permitted livery cab companies to sign up and receive a sticker affixed to the window, which gives consent for police officers to stop the livery cab to check, on among other things, the driver's well-being.  (Tr. 344-345) ("If they affix the stickers it's pretty much saying, hey, please watch after me because my job is dangerous as well.") According to the witness, a police officer ordinarily could not pull over a car (i.e. one not participating in a NYPD program) without first observing a traffic or criminal infraction. (Tr. 345.)  The officer testified that he had made stops of livery cabs that have resulted in arrests of backseat passengers.  (Tr. 347-348.)  Connizzo confirmed that unmarked police cars have a "light package," meaning that they have the ability to turn on red and blue flashing lights.  (Tr. 423, 486.)

I.      Defendants' Motion for Judgment as a Matter of Law

Rule 50(a), Fed. R. Civ. P., provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party," the Court may, upon motion by the opposing party, grant judgment as a matter of law in the movant's favor.  On a renewed motion under Rule 50(b), Fed. R. Civ. P., the Court may "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."  Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005).  "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against" the movant.  Id. (alterations and internal quotation marks omitted) (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)).  In construing Rule 50, the Supreme Court has explained that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000). Accordingly, when assessing a Rule 50 motion, "the [C]ourt should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  Id. (internal quotation marks omitted).

> A.    A Reasonable Jury Could Find Vicarious Liability of
>        the City for the Intentional Torts Against Hurt.

New York law has long permitted a finding of vicarious liability of an employer for intentional torts and acts of an employee "'no matter how irregularly, or with what disregard of instructions,'" provided the acts were in furtherance and within the scope of employment.  Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979) (quoting Jones v. Weigand, 134 A.D. 644, 645, (2d Dep't 1909)); see also De Wald v. Seidenberg, 297 N.Y. 335, 338 (1948) ("The master who puts the servant in a place of trust or responsibility . . . is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another."); Ramos v. Jake Realty Co., 21 A.D.3d 744, 745  (1st Dep't 2005) ("[a]n intentional tort, such as the assault here, committed by an

employee can result in liability for his or her employer . . . ."); Beauchamp v. City of New York, 3 A.D.3d 465 (2d Dep't 2004) (same).  On the other hand, an employee does not act within the scope of his employment "when he engages in tortious conduct for personal reasons separate and distinct from the interests of his employer particularly when the conduct involves acts not commonly done by those in his position."  Bello v. United States, 93 Fed. App'x 288, 291 (2d Cir. 2004) (citing Ierardi v. Sisco, 119 F.3d 183, 188 (2d Cir. 1997)).

The Court instructed this jury on the factors set forth in Riviello, 47 N.Y.2d at 303, and the jury found that the unidentified officer had acted in furtherance and within the scope of his authority.  The question presented on this motion is whether a reasonable jury could have so found.

The Riviello test is summarized in the Court's unchallenged instruction:

> An employer is responsible for the act of its employee if the act is in furtherance of the employer's interests and is within the scope of the employee's authority.  . . .  An act is within the scope of an employee's authority if it is performed while the employee is engaged in the performance of his or her assigned duties, or if the act is reasonably necessary or incidental to the employment.  The employer need not have authorized the specific act in question.

> Among the factors you may consider in deciding whether Sergeant Connizzo, or some other member of the NYPD, was acting within the furtherance of the City's interests and within the scope of his authority, you may consider the connection between the time, place and occasion for the act; whether the officer was on duty; the history of the relationship between the individual officer and the City of New York as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance and whether the specific act was one that the City of New York could have anticipated.

> Even if you find that the employee's act was reckless or intentional, the employer is still responsible for a plaintiff's injury and any resulting damages if you find that the employee was acting in furtherance of the employer's interests and within the scope of the employee's authority.

(Tr. 590-591, based on New York Pattern Jury Instructions §§2:235 & 2:237.)

      The trial evidence was sufficient to permit a reasonable jury to conclude that the two individuals who stopped the livery cab in which Hurt was a passenger were officers of the NYPD who were then on duty.  The trial testimony was that the area was from time to time patrolled by the Bronx Anti-Crime Unit using unmarked vehicles and officers in plain clothes.  No evidence was offered by either side about the livery cab, its driver or his company, including whether it was a participant in the TRIP program, but the Bronx Anti-Crime Unit pulled over livery cabs to check whether a driver was facing a dangerous situation.  During such stops, one of the items that officers looked for was guns.  The livery cab was pulled over by a car with flashing red and blue lights.  One of the individuals displayed a gold shield.  One of the individuals said he had pulled over ten vehicles that evening.  Hurt observed that one of the individuals sat in the back seat of the livery cab, and it is reasonable to infer that he was inspecting either the exterior, or, perhaps, the entire contents of the duffel bag.  Stopping livery cabs, questioning passengers and inspecting the exteriors of items in plain view in the back seat of a vehicle are acts that, under the proper circumstances, the City's police officers commonly undertake.  A reasonable jury could conclude that the two individuals were on-duty officers of the NYPD.

      The search of the inside of Hurt's pants pockets, the detention, the assault, the battery, as found by the jury, were tortious under New York law.  The fact that they were tortious, contrary to the patrol guide or otherwise unlawful does not mean that they could not be reasonably anticipated by the City in sending officers out on patrol.  The extent to which the departure was one from normal methods of performance was one

factor for consideration under <u>Riviello</u>.  The acts described in Hurt's testimony, wrong as they were, were not done for any apparent personal gain to the officers but to further the goals of the City in enforcing New York Penal Code and New York City Administrative Code.

Taking the trial evidence as a whole, a reasonable jury could conclude that the (1) both actors were officers of the NYPD on patrol in an unmarked car; and (2) applying the multi-factor <u>Riviello</u> test, the actions of the officers were in furtherance and within the scope of their authority.  Thus the evidence supports a finding that the City is vicariously liable.[1]

>B.     A Reasonable Jury Could Find That Striking
>       <u>Hurt with the Unmarked Car Was Negligent.</u>

Based on plaintiff's contentions, the jury was instructed that "Mr. Hurt claims that Sergeant Connizzo, or some other member of the NYPD, acted negligently by striking him with a vehicle."  (Tr. 587.)  The jury found that an officer of the NYPD other than Connizzo had negligently injured Hurt.  The City now argues that no reasonable jury could find negligence, and that the conduct, if it occurred, was intentional.

As noted, Hurt testified that he ran from the scene.  "As I get towards the end of the block, the car jumped the curb, hit my leg, my left leg, and I fell into the fence."  (Tr. 136.)  The right headlight of the car hit Hurt's knee but the car did not crash into any other object.  (Tr. 136, 215.)

The City takes the position that because the jury found that one of the officers intentionally assaulted Hurt by punching him three times, any subsequent

---

[1] The City makes much of the reference in Hurt's counsel's summation to "rogue" officers.  (Tr. 520, 533, 547, 551.)  These rhetorical flourishes in a lawyer's closing argument are not evidence and not determinative of the <u>Riviello</u> issue decided by the jury.

physical contact is necessarily intentional.  It is true that a party may not escape the consequences of an intentional act by arguing that he did not intend the precise injury. But here, there was a break in the events as they unfolded.  After the intentional battery had come to an end, Hurt elected to run.  The officers returned to their car and drove off. The fact that the prior acts were intentional does not necessarily control that which occurred thereafter.

Taking the trial evidence as a whole, a reasonable jury could have concluded that the action of the unidentified officer who was driving the car was negligent rather than intentional or reckless.  The incident occurred sometime around 2 a.m., in the dark of night.  A jury could reasonably infer that a driver who intentionally wanted to hit Hurt with the vehicle would have struck him in a different area of the body with a different part of the vehicle rather than making contact with Hurt's knee with the right headlight of the car.  The jury could have concluded that the officers were callous or oblivious in not stopping after striking Hurt but never intended any contact between the car and Hurt.

II.     Defendants' Motion for a New Trial

In determining whether a new trial is appropriate under Rule 59(a), Fed. R. Civ. P., the Court applies a less stringent standard than on a motion for judgment as a matter of law.  See Manlev v. Ambase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987).  "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence."  Manley, 337 F.3d at

245 (second alteration in original; internal quotations and citation omitted; quoting <u>Song</u>, 957 F.2d at 1047).

An error in a jury instruction may require a new trial unless the error was harmless.  <u>Boyce v. Soundview Tech. Grp., Inc.</u>, 464 F.3d 376, 390 (2d Cir. 2006).  An erroneous instruction is harmless if it did not influence the jury's verdict.  <u>Id.</u>

A. <u>The Verdict Was Not Against the Weight of the Evidence.</u>

The City argues that the jury's verdict on respondeat superior was against the weight of the evidence.  NYPD Officer Frank Siciliano testified to the practices of the Bronx Anti-Crime Unit.  The jury learned the purposes of the unit and how they often went about doing their work, particularly with regard to livery cabs.  Siciliano's testimony together with Hurt's testimony of what he saw, heard and experienced supported the jury's verdict.  The jury did not reach an erroneous verdict.  There was no miscarriage of justice.

The same is true with the jury's verdict on negligence.   The events with the unmarked police car occurred swiftly and while Hurt says he was running.  The injury to the knee was beyond serious question.  The jury's conclusion that the act was one of negligence rather than intent was neither erroneous nor a miscarriage of justice.

B. The Court Correctly Instructed the Jury that Liability on
State-Law Claims Could Be Based on the Conduct of
<u>An Unidentified Member of the NYPD.</u>

This action was originally file against two John Doe defendants.  It was not until more than a year-and-a-half into the case that Connizzo was named as a defendant.  The second officer continued to be identified in the Amended Complaint as a John Doe.  After discovery was concluded, the defendants moved for summary judgment

premised upon the theory that Connizzo was not on duty at the time of the events. For reasons that were explained at length in the Court's Opinion and Order, the Court denied summary judgment.

On November 21, 2018, two-and-a-half months before trial, plaintiffs submitted a revised proposed verdict sheet which contained jury questions relating to Sergeant Connizzo, and also the following: "Did an NYPD officer use excessive force against plaintiff James Hurt?" (Doc 106.) Similarly worded questions relating to "an NYPD officer" were posed as to unlawful stop and search, unlawful detention, assault and battery. (Id.) Defendants urged that plaintiff should be restricted to arguing that the participants in the stop were Connizzo and one John Doe officer. (Def. Mem., Motions in limine, 6; Doc 111.)

The Court handed the parties proposed jury instructions in two parts, the first part on the day of jury selection, and the second part on day two of the trial. (Court Ex. 4; Tr. 26, 129.) It gave the parties a proposed verdict sheet on day two of the trial. (Court Ex. 5; Tr. 313.) Defendants argued that the language in the Court's proposed instruction should be changed from "or some other member of the NYPD" should be replaced with "and an unidentified member of the NYPD." (Def. Ltr. Feb. 6, 2019.) The thrust of the defendants' position was that they accepted that liability could be premised upon Connizzo acting with another officer, but that if plaintiff was wrong that Connizzo was one of the two officers, then his claim should fail altogether. In other words, the City urged the Court to reject the premise that liability could be imposed on the City on principles of respondeat superior if both of the officers were unidentified.

The following colloquy ensued:

- 13 -

MS. WILSON: . . .We believe that the language "or some other member of the NYPD" should be replaced with "an unidentified member of the NYPD." [2]

THE COURT: Why?

MS. WILSON: Because in plaintiff's testimony he clearly identified Sergeant Connizzo as one of the involved officers. Then the John Doe in this matter would be one other involved officer, not just –

THE COURT: There is no other. There is no one else alleged to have participated other than one other.

MS. WILSON: That is correct, your Honor.

THE COURT: Mr. London, that sounds correct. Do you agree?

MR. LONDON: Judge, I think that the jurors could find that they believe Mr. Hurt's story but they also believe Sergeant Connizzo, and they believe it was two other NYPD officers. That could be something that the jurors –

THE COURT: What is your response to that?

MS. WILSON: That's not what plaintiff's testimony was. Plaintiff's testimony clearly identified that it was Sergeant Connizzo.

THE COURT: You are correct about that. But the jury doesn't decide the case on plaintiff's theory of the case. They decide it on the evidence before them. I am going to agree with the plaintiff on that. I'm charging based on the evidence that's in the case, not on a particular witness' testimony.

(Tr. 319.)

The jury was free to accept all of Hurt's testimony or accept such portions as it found credible. Hurt did not testify that the officer gave his name, wore a nameplate or a badge with a number linked to Connizzo. More than four years after the incident, he described the officer, who he identified in the courtroom as Connizzo, as "[h]eavyset, salt-and-pepper beard. He was bigger than me. That was pretty much it." (Tr. 113.)

---

[2] While the transcript reads "an unidentified member of the NYPD," the City's letter of February 6 made plain that they were seeking the words "and an unidentified member of the NYPD."

The jury reasonably could have believed that Hurt was testifying truthfully and accurately concerning the events but was simply mistaken as to the identity of the officer.  The Court's instructions in bland, neutral language accounted for that possibility.  The instruction was supported by the evidence and was legally correct.[3]  Plaintiff's counsel proposed the verdict question two-and-a-half months prior to trial, and defendants were therefore on notice that the Court might agree to the instruction.

      C.   The Court Fully Apprised Defendants of the Contents of the Jury Instructions Before Summation, and Defendants' Belated Request to Add Questions to the Verdict Form Did Not Require a Re-Opening of Summations.

Defendants urge that the "[t]he Court erred in not permitting defendant to give supplemental closing statements after the verdict form was changed postsummation."  (Def. Motion 17.)  The argument is misleading because defendants knew the content of the employer vicarious liability charge before it summed up, and first proposed the addition of questions on vicarious liability to the Verdict Form after it had summed up.  The Court agreed to add questions on the Verdict Form but declined to allow the defendants to reopen summations.  To be clear, the questions at issue on this portion of defendants' motion are not those related to the conduct of "some other member of the NYPD" but whether the conduct of that member of the NYPD was "within the scope of his authority as an employee of the City . . . ."

The trial was of short duration.  On the morning of jury selection, the Court provided the parties with the first section (Court Ex. 2) of the Court's instructions

---

[3] See Tardif v. City of New York, 344 F. Supp. 3d 579, 592 (S.D.N.Y. 2018) (collecting cases where courts have allowed state law respondeat superior claims to proceed against municipalities based upon the conduct of a "John Doe" defendant) (Wood, J.).

to the jury.  (Tr. 26-27; Court Ex. 2.)  On the second day of trial, the Court provided the parties with the Courts complete draft of the instructions (Court Ex. 4.), which was based upon the parties' submissions.  The Court's instruction on the vicarious liability of the City as employer was based upon New York Pattern Jury Instructions §§2:235 & 2:237 and did not thereafter vary.  The Court also supplied the parties with a draft Verdict Form which did not thereafter vary with the exception of the addition of two questions, Questions 10 and 11, relating to vicarious liability.

Either late on February 6 or on the morning of February 7, the defendants wrote in part "to advise the Court that the verdict sheet does not contain any questions regarding the City's liability under the theory of *respondeat superior.*"  (Def. Ltr. Feb. 7, 2019; Doc 136.)  After receiving and reviewing the letter, the Court revised the Verdict Form to add two questions (Question 10 for Connizzo and Question 11 for a member of NYPD other than Connizzo) asking whether the person "was acting within the scope of his authority as an employee of the City of New York?"  (Court Ex. 7.)  The Court distributed the revised Verdict Form to all counsel.  (Tr. 565.)  Defendants voiced no objections to the content of the two questions but sought to reopen summations.  (Id.) The Court denied the application.  (Id.) The following colloquy ensued:

> THE COURT: You are standing before the Court and you are urging a reopening of closing arguments on a matter that is at issue in this case that was in the jury instructions as circulated to you, and you say, we want to reopen closing arguments.  I'm asking you, when you stand before me and ask for that, do you have any support for it?

> MS. DeCASTRO: I think the support would be that we didn't anticipate this, and we did not realize that it was an issue until late last night when we read it over again.  But I understand your Honor's position.  I apologize.

> THE COURT: Are you withdrawing the position in the letter that you gave to me today?  In the letter that you gave me today I read you to assert that

the verdict sheet should have these two questions included. I'm delighted, and I think the plaintiff would be delighted to not have those two questions included. Would you like those two questions not included?

MS. DeCASTRO: No, your Honor. We would like them included.

(Tr. 566.)

To recap, the defendants knew the exact wording of the Court's charge to the jury on employer vicarious liability before counsel rose to sum up to the jury. After having delivered their summation, but before the Court delivered its instructions to the jury, defendants asked for the inclusion of a question on the Verdict Form on vicarious liability. The Court indicated that it would include two questions and defendants voiced no objection to the content of the questions. Defendants asked to reopen their summation to address the two questions, which the Court denied because the issue was fully covered in the draft jury instructions that they had in hand at the time of their summation. Aware that their summation would not be reopened, the Court offered to strike the two questions and the defendants indicated that they wanted them included. Charitably put, defendant's position is meritless.

### D. The Court Properly Declined Defendants' Request to Deliver a Sur-Rebuttal Summation, and Plaintiff's Use of a Defendants' Exhibit to Rebut a Claim of Fabrication Was Fair Argument.

Defendants claim it was improper for plaintiff's counsel to use in rebuttal a document (Def. Ex. G.) that indisputably was in evidence. Indeed, defendants had offered it into evidence and plaintiff initially objected. (Tr. 232) Defense Exhibit G was described as Civilian Complaint Review Board ("CCRB") closing report. Although defendants did not list it as an exhibit in the Joint Pre-Trial Order, they argued that there was no prejudice to plaintiff and that his counsel had known of the document long before

trial.  (Tr. 233.)  The Court sustained the objection subject to renewal of the offer on a

more complete record.  (Tr. 235.)  It was later offered and received without objection

from plaintiff.  (Tr. 499.)  Shortly thereafter both sides rested (Tr. 516) and summations

began.  (Tr. 520.)

   Before summations began, each side was allotted 25 minutes, and the

plaintiff, the party with the burden of proof, was also given the opportunity for a 10-

minute rebuttal.  (Tr. 520.)  Defendants closed to the jury that Hurt's testimony was a

fabrication.  (Tr. 536, 539-540.)  When it was plaintiff's turn for a ten-minute rebuttal, he

made the disingenuous assertion that "Ladies and gentlemen, I've been saving something

for you, something so juicy I've been saving to tell you until this moment."  (Tr. 548.)  It

was disingenuous because the document counsel was "saving" had been introduced by

the opposing party minutes before both sides rested.  Hurt's counsel pointed out that,

according to the CCRB closing report, Def. Ex. G., warrant checks had been run on

James Hurt, Jr. on July 2, 2014.  (Tr. 549.)  "Ladies and gentlemen, why in the world

would James Hurt, a man who has never been arrested, never been convicted of a crime,

have two warrant checks run on him.  Because the police officer did this, needed to find

him.  They were still looking for him, I submit to you, and that's what that shows."  (Id.)

Raising Defense Exhibit G and seeking to have the jury draw the inference that the

incident had not been fabricated by Hurt was fair rebuttal to defendant's summation.

   Defendants voiced no objection to this portion of the rebuttal summation,

although it did object on two unrelated matters.  (Tr. 548-549.)  After the rebuttal

summation was completed, the Court held a conference with counsel at which no

application was made with respect to the rebuttal summation.  (Tr. 552-554.)  The next

morning defense counsel complained that it did not have an opportunity to make a sur-

rebuttal.  The Court denied the application explaining:

> Now, I think the reference to the evidence in the closing argument rebutted
> assertions made in the defendants' closing argument.  If there was a claim
> that it was improper rebuttal, it was not made in a timely fashion.
>
> Why does timeliness matter?  Timeliness matters, particularly on something
> of this nature, because what the Court would do in real time, if it concluded
> that there was merit to the argument, is it might fashion something like,
> well, I'll give the defendant five more minutes to rebut the rebuttal, or I
> could strike it then and then Mr. London could finish up his closing in some
> other way.  But I find it was proper rebuttal and such is trial practice.  The
> defendants, who argued that Defendants' G was no surprise to the plaintiff,
> can hardly claim that Defendants' G was a surprise to the defendants.
> Before one offers an exhibit, one should review it very carefully and think
> of what use could the opposing side make of the very exhibit which I'm
> offering.  That's my ruling.

(Tr. 569-570.)  The Court adheres to its view expressed on the record.  It was a sound

exercise of discretion to deny defendants' request for a sur-rebuttal summation.

### E. The Court Properly Declined to Take Judicial Notice of Dr. Paynter's Prior Preclusion as an Expert.

Plaintiff disclosed that Ronald Paynter, M.D. would be one of his experts

during pre-trial discovery.  Dr. Paynter was included in the Joint Pre-Trial Order.  (Doc.

121 at 4.)  Dr. Paynter is employed by NYU School of Medicine and works principally at

Winthrop Hospital as an emergency attending physician managing the emergency

department.  (Tr. 248.)  Defendants objected to his being qualified as an expert but sought

no voir dire or side bar to support their objection.  (Tr. 250.)  The Court qualified him as

an emergency room medical expert.  (Id.)

On cross-examination, defendants' counsel inquired about his work as an

expert on "bloodless medicine," a subject matter not at issue in this case, but which had

been at issue in a prior case in which Dr. Paynter was a designated expert.  (Tr. 265.)  Dr.

- 19 -

Paynter responded that he held himself out in the referenced case as a hospital administrator and volunteered, "And the judge felt that that experience wasn't perfect for the case, and in Pennsylvania they have laws saying you have to be the exact expert, and they prefer a different type of expert."  In front of the jury, defense counsel asked the Court "to take judicial notice that the Court precluded him as a witness, finding that he mischaracterized . . . ."  (Tr. 266.)  At that point, the Court cut counsel off and held a side bar.

At the side bar, the Court expressed displeasure with defendants' counsel's decision to request in the presence of the jury that the Court take judicial notice of a document, describing the document, but with no advance notice of its content: "How would I be able to take judicial notice of it if I have never seen in in my whole life?  Have you ever provided me with a copy of it?"  (Tr. 267.)  Defendants' counsel responded in the negative.  (Id.)

Defendants' counsel then tendered a document to the Court at the sidebar that the Court reviewed while the jury waited patiently.  The Court ruled as follows: "The application is denied.  To the extent there is anything probative in here, it is substantially outweighed by the danger of unfair prejudice.  It appears that there were multiple reasons why Dr. Paynter's testimony was excluded."  (Tr. 268.)  A review of the tendered appellate court decision, <u>Seels v. Tenet Health Sys. Hahnemann, LLC</u>, 167 A.3d 190, 201 (Pa. Super. 2017), supports this Court's conclusion.  The holding was as follows:

> After review, we discern no abuse of discretion by the trial court in refusing to qualify Dr. Paynter to testify as an expert.  Dr. Paynter appears to conflate the medical objective of minimizing blood loss during surgery with a "bloodless medicine" program, which, as presented is primarily

administrative.  Dr. Paynter failed to establish that he had any specialized skill, knowledge, or experience in the area of bloodless medicine that would have aided the jury in the search for truth.  . . .  Rather, we agree with the trial court that Dr. Paynter's proposed testimony would have only served to confuse the jury.  Therefore, we conclude that Appellant is entitled to no relief on this claim of error.

Id. at 204-05.

The request to take judicial notice by defendants was not timely.  Rule 201(e), Fed. R. Evid. ("On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed.").  Defendants could have anticipated the potential need of having the Court take judicial notice long before trial.  Instead, on the fly, they furnished this Court with only the appellate court decision without either Dr. Paynter's underlying report or the trial court's complete findings.  Rule 201(c)(2) ("The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information.").

Counsel for both sides asked the Court for guidance on whether defendants' counsel could inquire about whether he mischaracterized something in his report.  The Court said, "When you ask a question, I'll rule on it."  (Tr. 269.)  When pressed, it added, "I think it's fair cross-examination." (Id.)  Defendants' counsel asked the witness as follows: "Dr. Paynter, didn't you mischaracterize evidence in your expert report in that case?"  (Tr. 271.)  No objection was raised and the witness was allowed to answer.  (Tr. 271.)  The Court did sustain objections to other questions that inquired into the Court's findings.  (Tr. 270.)

The Court perceives no error in its ruling declining to take judicial notice of the Pennsylvania court's rulings.

F.   The Damages Awarded Are Excessive and
     a Reduction of Damages Is Warranted.

As noted, the jury awarded Hurt $500,000 on the assault claim, $500,000 on the battery claim and $350,000 on the negligence claim.  The Clerk has entered judgment against the defendants in the total amount of $1,350,000, which defendants argue is excessive.  Rule 59(e) provides that a party may time move to alter or amend a judgment.

For the reasons that will be explained, the Court concludes that the jury's award deviates materially from maximum reasonable compensation, and the awards will be reduced as follows: $50,000 for assault, $300,000 for battery and $125,000 for negligence, for a total award of $475,000.  Hurt may stipulate to the reduced awards or proceed to a new trial on damages.

The jury was properly instructed that damages on each claim should be separately considered and that the award on each claim should be non-duplicative:

> First, you should not award compensatory damages more than once for the same injury.  For example, if the plaintiff were to prevail on two claims and establish an injury worth a certain amount, you cannot award him that certain amount of compensatory damages on each claim.  He is entitled only to be made whole again, not to recover more than he lost.  Of course, if different injuries are attributed to the separate claims, then you must compensate him fully for all the injuries.

(Tr. 592.)  The Court also instructed the jury that "[c]ompensatory damages are not only for expenses that a plaintiff may have borne.  A prevailing plaintiff is entitled to compensatory damages for physical injury, pain and suffering, emotional and mental anguish, and shock and discomfort that he or she has suffered because of defendants' conduct."  (Tr. 592.)

The jury's awards were for claims arising under New York law. "A federal court, in reviewing the amount of damages awarded on a state law claim, must apply New York law." Patterson v. Balsamico, 440 F.3d 104, 119 (2d Cir. 2006). "In an action brought to recover damages for personal injury under New York law, a monetary judgment is excessive 'if it deviates materially from what would be reasonable compensation.'" Rangolan v. Cnty. of Nassau, 370 F.3d 239, 244 (2d Cir. 2004) (quoting CPLR 5501(c)). "A district court applying this standard 'reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented.'" Id. (quoting Presley v. United States Postal Service, 317 F.3d 167, 173 (2d Cir. 2003)).

"Where the basis for the remittitur order is the district court's view that the award is 'intrinsically excessive,' i.e., is greater than the amount a reasonable jury could have awarded but the excess is not attributable to a discernible error, the court should reduce the award only to the maximum amount that would be upheld by the district court as not excessive, for one objective of a conditional remittitur is to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain." Id. (quotation marks, alterations and citations omitted). "Reduction only to the highest amount that the jury could properly have awarded is the only theory that has any reasonable claim of being consistent with the Seventh Amendment." Id. (quotation marks omitted).

When a reviewing court concludes that a damages award is excessive, a new trial is to be held on the issues of damages, unless the plaintiff stipulates to reduce the award to an amount determined by the Court. See, e.g., West v. Hogan, 18 N.Y.3d

915 (2012); Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of

Plumbing & Pipefitting Indus. of U.S. & Canada, 973 F.2d 1050, 1064 (2d Cir. 1992)

("the court should not decrease damages based on its belief that they are excessive

without affording the option of a new trial.").

      A.  Assault.

      The jury was instructed as to the separate elements for assault, battery and

negligence.  The Court gave the following instruction as to the assault claim.

> An assault is the intentional placing of another person in apprehension of imminent harmful or offensive contact.  A defendant is liable for assault when he intentionally causes another person to become concerned that the defendant is or is about to cause a harmful or offensive bodily contact.  . . .

> In order to commit an assault, the defendant must have the real or apparent ability to bring about the harmful or offensive bodily contact.  Ordinarily, threatening words without some action are not enough to constitute an assault.  There must be some menacing act or gesture that causes the plaintiff to believe that a harmful or offensive bodily contact is about to occur.  It is not necessary that there be any contact.

(Tr. 584.)  As noted, the jury awarded Hurt $500,000 in damages as to the assault claim.

      The trial evidence did not describe any physical injury arising out of the

assault, but Hurt and his father described mental anguish and emotional distress that a

reasonable jury could attribute to the assault.  Hurt testified that after the vehicle was

pulled over, an officer other than Connizzo instructed him to exit the vehicle, and that he

complied.  (Id. 114-15.)  Hurt testified that "[a]s I'm stepping out, he is reaching forward

towards me, and I stepped back, put my hands up and I said, I don't condone searches."

(Id. 115.)  The officer proceeded to pat down Hurt, over his objection.  (Id. 116.)

      Hurt followed the officer's instruction to stand behind the livery cab and

in front of the unmarked vehicle.  (Id. 117.)  He testified that the officer was "standing

- 24 -

right in front of me" while Connizzo searched the livery cab's back seat.  (Id. 118.)  Hurt

stated that he attempted to show the officer a badge signifying that his father worked as a

corrections officers, but the officer told him to put it away.  (Id. 118-19.)  Hurt testified,

"And I'm standing facing the officer, you know.  And he told me:  Don't look that way.

Continue facing me, which I did.  And I'm standing there."  (Id. 135.)  Hurt testified: "I

am standing there, you know, and some time has gone by, so I'm getting a little

concerned.  I'm scared at this point.  I look over my shoulder again.  I asked: What are

you guys looking for.  And as soon as I could even get the words out, he struck me with

his forearm, he pushed me."  (Id. 119.)[4]  Hurt fled on foot shortly thereafter, and testified

that he was "scared for my life."  (Id. 137.)  Based on Hurt's testimony and telephone

records, the entire incident lasted from approximately 1:51 a.m., when he was speaking to

his girlfriend and was instructed to end the call, until 2:09 a.m., when he placed a one-

minute call to his girlfriend from the alley.  (Id. 145.)

> Hurt testified that following this incident, he is "not comfortable at all"
around law-enforcement officers or police lights.  (Id. 183-84.)  He testified that prior to
the incident, he "wanted to be a cop" but that he changed his career goals.  (Id.)  Hurt's
father, James Hurt, Sr., testified that following the incident, plaintiff Hurt "is not as
trustworthy [sic] with people" and "limits" himself.  (Id. 60.)

> A reasonable jury could conclude that Hurt described garden-variety
mental anguish and emotional distress arising out of the assault.  Hurt was in
apprehension of harmful or offensive bodily contact for a brief period of time, during
which he had the presence of mind to object to the search, offer a form of identity and

---

[4] The Court will discuss the ensuing physical injuries in connection with damages on Hurt's battery and
negligence claims.

identify has father as a corrections officer.  Hurt did not testify that he has received

psychiatric or psychological treatment, or that he uses antidepressants or other

prescription medication.  He did not identify lingering symptoms of mental anguish, such

as post-traumatic stress disorder, an inability to maintain close relationships, difficulty

sleeping, or stress-based physical ailments.

        Damages arising from "emotional injury do[] not readily translate into

dollar amounts . . . ."  Mathie v. Fries, 121 F.3d 808, 814 (2d Cir. 1997).  "In garden

variety emotional distress claims, the evidence of mental suffering is generally limited to

the testimony of the plaintiff, who describes his or her injury in vague or conclusory

terms, without relating either the severity or consequences of the injury.  Such claims

typically lack extraordinary circumstances and are not supported by any medical

corroboration.  'Garden variety' emotional distress claims generally merit $30,000 to

$125,000 awards."  Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)

(internal citations and quotation marks omitted).

        "New York cases vary widely in the amount of damages awarded for

mental anguish."  Cross v. New York City Transit Auth., 417 F.3d 241, 258 (2d Cir.

2005) (quotation marks omitted).  "'Many do reduce awards to $30,000 or below.

However, other cases uphold awards of more than $100,000 without discussion of

protracted suffering, truly egregious conduct, or medical treatment.'"  Lore v. City of

Syracuse, 670 F.3d 127, 177-78 (2d Cir. 2012) (quoting Meacham v. Knolls Atomic

Power Lab., 381 F.3d 56, 77 (2d Cir. 2004), vacated and remanded for further

consideration on other grounds, 544 U.S. 957 (2005)); see also Reiter v. Metro Transp.

Auth. of N.Y., 2003 WL 22271223, at *9 (S.D.N.Y. Sept. 30, 2003) (reduction of an

award is appropriate where there is "sparse evidence with respect to the magnitude and duration of emotional injury or mental distress.") (Koeltl, J.); <u>Fowler v. New York Transit Auth.</u>, 2001 WL 83228, at *14 (S.D.N.Y. Jan. 31, 2001) ("evidence that a plaintiff sought medical or psychiatric treatment generally entitles a plaintiff to greater damages for mental anguish and emotional distress.") (Koeltl, J.).  <u>Lore</u> rejected the proposition that $30,000 is presumptively the appropriate award for "garden variety" distress.  670 F.3d at 177-78.

Both before and after <u>Lore</u>, courts have examined the duration and intensity of a plaintiff's symptoms, as well as evidence of medical treatment, in determining whether a jury award provides reasonable compensation.  <u>See generally</u> <u>Stampf v. Long Island R. Co.</u>, 761 F.3d 192, 207 (2d Cir. 2014) (accepting the district court's conclusion that plaintiff suffered "greater than garden variety emotional distress" as a result of malicious prosecution, but reducing damages from $200,000 to $100,000 based on evidence that plaintiff felt "ashamed and mortified," began to drink excessively, ended a romantic relationship and required prescription medication to help with sleep, among other symptoms); <u>Duarte v. St. Barnabas Hosp.</u>, 341 F. Supp. 3d 306, 320-25 (S.D.N.Y. 2018) (reducing damages from $624,000 to $125,000 based on plaintiff's testimony of sleeplessness, anxiety, headaches, stomach aches and a loss of self-esteem over a multi-year period) (Gardephe, J.); <u>Rainone v. Potter</u>, 388 F. Supp. 2d 120, 126 (E.D.N.Y. 2005) (reducing emotional distress damages from $175,000 to $50,000 where plaintiff was diagnosed with major depression, but had no physical manifestations of distress or "debilitating alterations in lifestyle, and no evidence of permanency.") (Spatt, J.); <u>Reiter</u>, 2003 WL 22271223, at *9 (reducing mental-anguish award from $140,000 to

$10,000 where "plaintiff testified to feeling 'stressed,' 'nervous,' 'on edge,' and 'clammy,' but he also admitted that he never had trouble eating or sleeping and he never sought medical or psychological help."); Fowler, 2001 WL 83228, at *13-15 (reducing award from $50,000 to $25,000 when plaintiff's testimony describing problems with sleeping, appetite, depression and headaches was corroborated by her treating physician).

In this case, the jury's award of $500,000 deviates significantly from the reasonable compensation for any mental anguish or emotional distress arising from the assault on Hurt. The Court concludes that an award of $50,000 is "the highest amount that the jury could properly have awarded" in light of the evidence. Rangolan, 370 F.3d at 244. Such an award is on the low end of damages recently awarded for garden-variety mental anguish, but it is adequate to compensate Hurt for the brief period during the incident in which he felt "scared" and "concerned" when confronted by the officer. (Tr. 119.) It accounts for his testimony that he is "not comfortable" around law enforcement and the testimony of Hurt Sr. that the plaintiff now "limits himself" and is less trusting of people, as well as plaintiff's testimony that he changed his earlier plans to pursue a career as a police officer. (Id. 183-84, 60.) A damages award of $50,000 credits the testimony of Hurt and Hurt Sr., but also accounts for the vague and general nature of their descriptions, and the relative lack of severity of his symptoms as compared to higher damages awards.

The Court therefore concludes that $50,000 is the highest amount that a jury could have properly awarded on Hurt's assault claim.

B. Battery.

The Court gave the following instruction as to the battery claim:

> One who seeks to make a lawful arrest, or has another person lawfully in custody, has the right to use as much force as he reasonably believes is necessary in order to make the arrest or detention, and can be held liable only if no force was necessary or the force used was excessive or he had no right to make a lawful arrest or detention of the plaintiff. . . .
>
> Taking into consideration all of the circumstances existing at the time and place of the alleged incident, if you find that it was not reasonable for Sergeant Connizzo, or another member of the NYPD, to believe that Mr. Hurt had committed a crime, then Sergeant Connizzo, or another member of the NYPD, was not justified in using force at all, and you will find that the relevant defendant committed a battery.

(Tr. 586-87.) As noted, the jury awarded Hurt $500,000 in damages as to the battery claim.

At trial, Hurt described his physical injuries arising out of the battery. He stated that when he asked the officer he identified as Connizzo what he was looking for by searching his bag, the second officer struck him with his forearm and pushed him. (Tr. 119.) Hurt testified that he "stumbled back," at which point, the officer he identified as Connizzo exited the vehicle and asked Hurt where he was going. (Id. 119-20.) Hurt testified that the officer he identified as Connizzo then pushed him, that Hurt fell to the hood of the parked law-enforcement vehicle, and that he landed on the ground. (Id. 120-21.) Hurt testified that the other officer then pulled Hurt's arm back, and that the officer he identified as Connizzo punched him three times in the mouth. (Id. 121-22.)

Hurt testified that he was "terrified" because he had not provoked the officers, the hour was late, and no vehicles or pedestrians were on the street. (Id. 122.) At that point, he fled, was struck by the officers' vehicle and hid in the alley overnight, before telephoning his mother at daybreak with the assistance of a stranger. (Id. 153-54.) Hurt testified that around the time he was fleeing the officer, the pain in his shoulder was "excruciating" and "10 out of 10." (Id. 142, 222.)

- 29 -

Hurt's mother and father arrived in separate vehicles, and his father drove him to St. John's Hospital in Yonkers for treatment.  (Id. 155-56.)  Photos taken by Hurt Sr. of Hurt's injuries were received into evidence.  (PX 4.)  Hurt testified that he left the hospital in a wheelchair and was still in pain at the time.  (Tr. 159-60.)  Hospital records stated that Hurt arrived with a right shoulder dislocation, left shoulder pain, left ankle pain, right third digit pain and multiple abrasions and lacerations.  (Tr. 161-62; PX 1.)

Hurt received follow-up treatment at Island Musculoskeletal in the Bronx, which he visited five or six times.  (Tr. 162-63; PX 6.)  He later had shoulder surgery at Montefiore Medical on October 7, 2014.  (Tr. 164-65; PX 5.)  Hurt did not return to work until January 2015.  (Tr. 165.)

Hurt testified that he continues to have a limited range of motion in his arm, but that doctors have indicated he was likely to regain a full range of motion over time.  (Tr. 181, 239.)  Hurt testified that he is unable to raise his shoulder above his head and was unable to play basketball.  (Tr. 181.)  Dr. Paynter testified that based on his examination, Hurt has a restricted range of motion that limits his ability to lift and reach.  (Tr. 257.)

Hurt Sr. also testified that Hurt had gained weight since the incident.  (Tr. 60-61.)

Hurt did not offer evidence of lost earnings during the period when he was unable to work, nor did he offer evidence of medical expenses.  However, the evidence was sufficient for a reasonable jury to award damages for Hurt's past and future and pain and suffering.

The Court has reviewed the authority cited by defendants in support of reducing the jury's battery award, which include cases awarding damages for pain and suffering that range from $20,000 to $250,000 for comparable injuries.  DiSorbo v. Hoy, 343 F.3d 172, 183-86 (2d Cir. 2003) (reducing $400,000 award on excessive force and battery claims to $250,000 where incident left plaintiff with extensive bruising and two hematomas, and choking caused her to struggle to breathe and begin to lose vision); Brim v. City of New York, 2016 WL 11263170, at *6 (E.D.N.Y. Aug. 16, 2016) (recommending new trial on damages where jury awarded plaintiff $30,000 to plaintiff who suffered "severe fracture" to her knee, requiring surgery, 23 days of hospitalization and use of crutches and leg brace for a total of 18 months, and observing that the lowest identified award for a comparable injury totaled more than $300,000), R&R adopted, 2017 WL 2445046 (E.D.N.Y. June 6, 2017); Konfidan v. FF Taxi, Inc., 95 A.D.3d 471, 472 (1st Dep't 2012) (affirming reduction of $400,000 award to $250,000 to plaintiff who suffered shoulder tearing in a vehicle accident, which necessitated surgery and physical therapy, and caused pain on a daily basis); Benjamin v. City of N.Y., et al., 15 Civ. 2319 (FB) (E.D.N.Y. June 7, 2017, Doc 66) (jury award of $150,000 to plaintiff who claimed officer threw him to the ground, then punched and struck him in the head); Caban v. City of New York, 46 A.D.3d 319, 320 (1st Dep't 2007) (affirming award of $50,000 for past pain and suffering and $125,000 for future pain and suffering where plaintiff suffered labral tears to both shoulders and underwent successful surgery, and noting that while plaintiff could no longer participate in "strenuous" leisure activities or overhead lifting, he was not disabled from working or the activities of daily life); Alicea v. City of N.Y., et al., 13 Civ. 7073 (JGK) (S.D.N.Y. Sept. 7, 2016, Doc 139) (judgment

of $150,000 on excessive force claim where plaintiff claimed permanent injuries to rotator cuff and wrist after being pushed into a police vehicle); <u>Simeon v. Urrey</u>, 278 A.D.2d 624-25 (3d Dep't 2000) (affirming denial of additur motion where jury awarded $20,000 for past pain and suffering arising out of a bone fracture incurred in a forklift accident); <u>Zimmerman v. Rosiek</u>, 245 A.D.2d 1048, 1049 (4th Dep't 1997) (increasing award of $25,000 to $75,000 for past pain and suffering and awarding $25,000 for future pain and suffering where plaintiff suffered a herniated cervical disc that required surgery and resulted in permanent loss of neck flexibility).

Recently, in <u>Thompson v. Toscano</u>, 166 A.D.3d 446, 447 (1st Dep't 2018), the First Department affirmed the trial court's reduction of damages in a case where plaintiff suffered "a partial labral tear to the left shoulder" in a vehicle accident, which required surgery and two courses of physical therapy.  Plaintiff had intermittent pain and a loss in her range of motion, and potentially required additional future physical therapy and surgery.  <u>Id.</u>  The trial court reduced the award for past pain and suffering from $400,000 to $300,000, and reduced the award for future pain and suffering from $750,000 to $250,000.  <u>Id.</u>

Here, the award of $500,000 deviates significantly from the reasonable compensation for Hurt's pain and suffering arising out of the battery.  Based on the above decisions and the injuries described by Hurt, the Court concludes that an award of $300,000 is "the highest amount that the jury could properly have awarded" in light of the evidence.  <u>Rangolan</u>, 370 F.3d at 244.  That figure accounts for past pain and suffering, including the dislocation of Hurt's right shoulder, the physical therapy and surgery it required, and his testimony that the pain at the time of the incident was "10 out

of 10." It accounts for future pain and suffering that Hurt is likely to experience based on his limited range of motion, including limitations to his physical activity. An award of $300,000 is on the high end of what is reasonable, but is consistent with the injuries described in the 2012 Konfidan case and the 2003 award in DiSorbo, a sixteen-year-old decision in which plaintiff's pain and suffering were heightened by an act of choking.[5] It also is consistent with the First Department's recent Thompson decision, which awarded a total of $550,000 for past and future pain and suffering based on a shoulder injury similar to Hurt's; however, unlike the Thompson plaintiff, there is no evidence that Hurt may require additional surgery, and there is some evidence that he is likely to eventually regain the full range of motion for his injured arm.

The Court therefore concludes that $300,000 is the highest amount that a jury could have properly awarded on Hurt's battery claim.

### C. Negligence.

The Court gave the following instruction as to the negligence claim:

> Mr. Hurt claims that Sergeant Connizzo, or some other member of the NYPD, acted negligently by striking him with a vehicle. . . .

> If you find, by a preponderance of the evidence, that Sergeant Connizzo, or another member of the NYPD, failed to act as a reasonably prudent person by striking Mr. Hurt with a vehicle, you will find that either Sergeant Connizzo, or another member of the NYPD, was negligent.

(Tr. 587-88.) As noted, the jury awarded Hurt $350,000 as to the negligence claim.

At trial, Hurt testified that after he fled on foot, the officers pursued him in their unmarked vehicle. (Tr. 135.) He stated that the car drove alongside him and swerved, and that "the car jumped the curb, hit my leg, my left leg, and I fell into the

---

[5] Per the Department of Labor's online Consumer Price Index calculator, $250,000 in 2002 is equivalent to approximately $356,000 in February 2019. See https://data.bls.gov/cgi-bin/cpicalc.pl.

fence." (Tr. 136.)  Hurt testified that he was struck in the left leg, near his knee, by "[t]he

passenger's side, the front where the headlight is, front headlight."  (Tr. 136.)  He stated

that when he fell into the fence, his finger became caught.  (Tr. 137.)  Hurt climbed over

the fence, ran through a grassy area, and then climbed over a second fence.  (Tr. 140-41.)

Evidence at trial included photos that Hurt's father took in the hospital of a scrape to

Hurt's knee and an injured finger.  (PX 4.)  Hurt testified that while he waited overnight

in the alley, he realized that his ankle was swollen.  (Tr. 146.)  When he was discharged

from the hospital, Hurt wore an ankle brace and "a soft cast around my finger . . . ."  (Tr.

158.)

        Dr. Paynter testified that hospital records reflected "finger maceration and

slight tenderness" on Hurt's right middle finger, indicating that the finger was "sort of a

chopped up" and "not a straight cut.  (Tr. 252-53.)  He stated that Hurt also received two

stitches on the front of his left thigh for a laceration that was "about one inch . . . ."  (Tr.

253-55.)  Dr. Paynter also testified that hospital records reflected that Hurt "basically had

a sprained ankle here."  (Tr. 254.)

        Hurt also testified that he had a laceration to his forearm that required

stitches and scratches to his stomach, but he was uncertain how, precisely, those injuries

occurred.  (Tr. 230-31.)   He testified that the laceration to his forearm happened "after

the car hit me."  (Tr. 230.)  Dr. Paynter testified that, based on Hurt's medical records,

the laceration to the forearm was approximately five inches long and required 23 stitches.

(Tr. 254.)  Hurt Sr. testified that Hurt is often uncomfortable wearing short-sleeve shirts

because they show scarring to his arm.  (Tr. 60.)  A reasonable jury could have concluded

that the forearm laceration and stomach scratches arose as a foreseeable consequence of the driver's negligence.

As with the battery claim, Hurt did not offer evidence of medical expenses or lost wages arising out of the negligence claim. However, a reasonable jury could have concluded that Hurt was entitled to damages for past and future pain and suffering.

The Court has reviewed the damages awarded for injuries comparable to those of Hurt's. Depending on the extent of medical treatment, prominence of scarring and duration of pain, total pain and suffering awards have ranged from $25,000 to $235,000. See Poulos v. City of New York, 2018 WL 3750508, at *7 (S.D.N.Y. July 13, 2018) ("Compensatory damage awards for single incidents involving strikes by police officers that result in loss of consciousness and associated lacerations—but do not cause further injuries requiring surgery, or broken bones—frequently run between $50,000 and $100,000."), R&R adopted, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018); Jordonne v. Ole Bar & Grill, Inc., 2016 WL 3409088, at *10 (S.D.N.Y. Apr. 26, 2016) (recommending on default judgment an award of $25,000 where plaintiff's injury consisted of a laceration that did not require sutures), R&R adopted, 2016 WL 3360524 (S.D.N.Y. June 16, 2016); Quigley v. Coco's Water Cafe, Inc., 85 A.D.3d 998, 999 (2d Dep't 2011) (award of $100,000 for past paint and suffering and $75,000 for future pain and suffering was reasonable where plaintiff suffered two lacerations to his face, was self-conscious about scarring, and spent two weeks unable to eat, drink or sleep); Poznyakovskiy v. City of New York, 2008 WL 842438, at *4-5 (E.D.N.Y. Mar. 11, 2008) (recommending on default judgment an award of $50,000 for past and future pain and suffering where a blow to the head left a five-centimeter laceration on plaintiff's scalp that required stitches

and was thereafter treated with Tylenol); <u>Vogt v. Paradise Alley</u>, 30 A.D.3d 1039, 1040 (4th Dep't 2006) (award of $75,000 for past pain and suffering and $160,000 for future pain and suffering was reasonable where plaintiff sustained lacerations to her forehead, was sensitive about extensive facial scarring, and, two years after the underlying incident, required additional surgery); <u>Denman v. Sanders</u>, 2006 WL 452018, at *8 (S.D.N.Y. Feb. 24, 2006) (reducing damages from $250,000 to $50,000 where plaintiff's "minimal injury" included laceration and bleeding, resulting in a quarter-inch scar above his eye).

   The Court concludes that an award of $125,000 is "the highest amount that the jury could properly have awarded" in light of the evidence. <u>Rangolan</u>, 370 F.3d at 244. There was evidence that Hurt suffered a sprained ankle, an injury to his knee, and a finger injury that was treated with a soft cast, but no evidence that those injuries required further medical procedures, have caused Hurt chronic pain or have permanently limited his activities. Hurt separately suffered lacerations to his left thigh and his left forearm, both of which required stitches. The laceration to the forearm was approximately five inches long, required 23 stitches and left permanent scarring, which was shown to the jury, while the thigh laceration was less prominent. Hurt and Hurt Sr. both testified that plaintiff Hurt was uncomfortable wearing short-sleeved shirts. Although Hurt did not describe permanent physical limitations from these injuries, he was injured in several places (the ankle, knee, finger, thigh and forearm) and the scarring to his forearm is permanent. The Court therefore concludes that the jury's award of $350,000 was unreasonable, but that an award of $125,000 reasonably compensates him for pain and suffering arising out of negligence.

CONCLUSION.

   The City's motion pursuant to Rules 50 and 59(a)(1)(A) is DENIED.  Its motion pursuant to Rule 59(e) is GRANTED.  Plaintiff may stipulate to reduced damages and an amended judgment in the amount of $475,000 or proceed to a new trial on damages.

   The Clerk is directed to terminate the motion.  (Doc 155.)

   SO ORDERED.


P. Kevin Castel
United States District Judge


Dated: New York, New York
   November 6, 2019